**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>            Plaintiff,<br><br>v.<br><br>POPULUS FINANCIAL GROUP, INC.,<br>d/b/a ACE CASH EXPRESS, INC.,<br><br>            Defendant. | Civil Action No.:<br><br><br>**<u>Complaint</u>** |

The Consumer Financial Protection Bureau ("the Bureau") brings this action against Populus Financial Group, Inc. doing business as ACE Cash Express, Inc. ("ACE" or "Defendant") and alleges as follows:

**<u>INTRODUCTION</u>**

1.     The Bureau brings this action under Sections 1031(a), 1036(a), and 1054 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), and 5564(a), based on Defendant's violations of the CFPA in connection with its offering, providing, and collection of payday and title loans to consumers.

2.     ACE engaged in unfair, deceptive, and abusive acts or practices by concealing the option of a free repayment plan to consumers who indicated that they could not repay their short-term, high-cost loans originated by ACE. By doing so, ACE generated at least $240 million in reborrowing fees and kept consumers in unaffordable cycles of debt.

3.     In addition, when ACE attempted to collect payment on its payday and title loans, ACE unfairly made electronic withdrawals of consumers' money without their authorization.

4.    The Bureau seeks permanent injunctive relief, restitution, disgorgement, damages, civil money penalties, and other relief for Defendant's violations of the CFPA.

## JURISDICTION AND VENUE

5.    The Court has subject matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

6.    The Court has personal jurisdiction over Defendant and venue is proper in this district because Defendant has its principal place of business in this district and is located, resides, and does business in this district.

## PLAINTIFF

7.    The Bureau is an independent agency of the United States created by the CFPA, 12 U.S.C. § 5491(a), that is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5563, 5564.

8.    The CFPA is a Federal consumer financial law. 12 U.S.C. § 5481(14). Under Sections 1031 and 1036 of the CFPA, it is unlawful for any "covered person" to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or to otherwise commit any act or omission in violation of a Federal consumer financial law. 12 U.S.C. §§ 5531(a), 5536(a)(1)(A). It is also unlawful for any covered person to commit or engage in any unfair, deceptive or abusive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

9.    The Bureau is authorized to commence civil actions in federal district court, in its own name, to address violations of Federal consumer financial laws, including violations of the CFPA. 12 U.S.C.§ 5564(b).

**DEFENDANT**

10.     ACE is a Texas corporation that is headquartered at 300 E John Carpenter Freeway, Suite 900 Irving, TX, 75062.

11.     At all times material to this complaint, ACE has offered and provided payday and title loans to consumers and collected on payday and title-loan debts from consumers.

12.     Payday and title loans are offered or provided for use by consumers primarily for personal, family, or household purposes and are therefore "consumer financial product[s] or service[s]" under the CFPA. 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x). ACE is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6)(A).

**FACTUAL BACKGROUND**

13.     ACE offers a variety of financial products, including high-cost, small-dollar consumer loans (including payday and title loans), bill payment, check-cashing and prepaid debit-card services to mostly low-income consumers.

14.     ACE has approximately 979 stores in 22 states and the District of Columbia.

15.     Since 2006, ACE has been owned by JLL Partners, a private-equity firm based in New York City.

16.     "Payday loans," as used here, refers to short-term, unsecured loans, made to consumers to provide funds in anticipation of an upcoming paycheck.

17.     "Title loans," as used here, refers to short-term loans made to consumers secured by the title to the borrower's vehicle.

18.     ACE charges consumers triple-digit annual percentage rates for its payday and title loans.

19.     ACE is one of the largest payday lenders in the country.

20.     ACE is subject to supervisory and licensing examinations by certain states and the Bureau.

21.     On July 10, 2014, after an examination and investigation, the Bureau found that ACE had violated the CFPA when it induced existing consumers to take out new ACE loans with accompanying fees despite those consumers demonstrating that they could not repay their current loans. ACE was ordered to pay a $5 million civil money penalty and $5 million in restitution to consumers.

22.     The resulting consent order, which is still in effect, requires that ACE take affirmative actions to prevent it from violating consumer financial protection laws. For example, ACE must record and regularly monitor its debt-collection calls and may not encourage or suggest that a delinquent consumer should take out a new loan from ACE immediately after paying off their current loan.

REPAYMENT OPTIONS

23.     ACE payday and title loans are typically structured to be short-term, single-payment loans with triple-digit annualized interest rates. ACE borrowers frequently refinance or reborrow, roll-over, or otherwise extend their loans beyond the original repayment term.

24.     Borrowers who reborrow by refinancing their loans are typically charged the same triple-digit annualized interest rate they were charged at loan origination, which extends their loan for 14 or 30 days, depending on the type of loan. For example, a consumer who borrowed $1,500 from ACE and owed a single payment of $1,850 ($1,500 in principal and $350 in fees) in two weeks would be charged an additional $350 to extend repayment of the loan for another two weeks.

25.     Many consumers pay to reborrow their ACE loans multiple times before ultimately paying back or defaulting on the loan, paying additional interest or fees each time they reborrow.

26.     At various times since July 2014, however, consumers in ten states—Arizona, Georgia, Idaho, Louisiana, Minnesota, Missouri, New Mexico, Ohio, Tennessee, and Texas— had a contractual right to one free repayment plan per year if they indicated that they could not repay their payday or title loan.

27.     In Louisiana and Idaho, the contractually provided repayment plan is required by state law. In the remaining states, ACE was required to provide the right to a free repayment plan by its national trade association, Financial Service Centers of America, as a condition for continued membership.

28.     Under the free repayment plan that ACE was required by its national trade association to offer, consumers would owe their outstanding balance in four equal installments over their next four paydays without paying any additional fees or interest. Unlike the refinance payments a consumer would make in order to reborrow, the consumer's first repayment under the free repayment plan would not be due until after the consumer's next payday.

29.     In numerous instances, the refinance fee paid by repayment-plan-eligible consumers was greater than even the *first* payment would have been had they used the free repayment plan. For these consumers, refinancing was not only more expensive than using the free repayment plan, it also required them to pay more up front.

30.     Although many consumers had the contractual right to this free repayment plan, ACE created the impression that they did not, instead inducing them to reborrow by refinancing their loans.

31.     Pursuant to an ACE policy in effect until at least March 2020, ACE employees would make calls to consumers shortly before their loans were due ("Reminder Calls"), and if any consumer expressed a current inability to repay their loan, ACE employees would offer the consumer repayment options in a prescribed sequence or "payment option waterfall."

32.     ACE offered consumers who expressed a current inability to repay their loan repayment options in this order: (1) a three-day grace period within which to pay the loan in full; (2) reborrow through a refinance (at a fee); and then (3) the free repayment plan.

33.     ACE told consumers about the free repayment option only if they rejected or were ineligible for the first two options in the payment waterfall. As a result, depending on the consumers' response to the first two options presented, ACE may not make any mention of the free repayment plan to which consumers were entitled.

34.     Consumers presented with the first two repayment options by ACE were likely to believe that all repayment options available to them had been presented by the ACE employee; therefore, there was no need to consult their contract to discover an unidentified option.

35.     After Bureau examiners identified potentially deceptive and abusive acts or practices related to its payment waterfall in December 2019, ACE began revising its training materials and pledged in a January 2020 letter to the Bureau that, after March 2020, it would simultaneously offer refinances and free repayment plans to consumers.

36.     ACE has not done as it pledged. ACE has continued to tell eligible consumers on Reminder Calls about fee-based refinancing without telling them about the free repayment plan.

37.     As of March 2020, ACE has in some email communications with consumers mentioned that consumers can call to ask about a repayment plan. But ACE's emails lack clarity about what the company is offering and consumers reading ACE's emails could reasonably

conclude that the repayment plan is the same as refinancing. The emails also do not state that the repayment plan, unlike reborrowing by refinancing, is free. Significantly, the emails provide a prominent link allowing consumers to refinance online but do not provide any means for consumers to enroll in the free repayment plan online. Instead, consumers wishing to enroll in the free repayment plan must request it at the storefront or on an unrecorded call with an ACE employee.

38.    For example, an email used by ACE after March 2020 offers consumers the following options:

1. Pay the full loan amount on your due date **$1,000**
2. **Not ready to pay in full? Refinance your loan until your next pay date or call us to discuss payment plan arrangements.** To refinance, <span style="color:green">**log into your account**</span> and follow the online instructions prior to 12:00 p.m. the business day before your due date. We will ACH your payment of $ from your bank account on your due date. *Call (866) 355-6815 to discuss payment plan arrangements.
3. Pay your loan off early by calling (866) 355-6815.
   (Emphasis in original)

39.    Accordingly, ACE continues to induce consumers with an inability to repay their existing loans into refinancing instead of enrolling in the free repayment plan option.

40.    In numerous instances, consumers who paid ACE to reborrow by refinancing while eligible for a free repayment plan, before and after March 2020, did not know about the free repayment plan when they refinanced.

41.    If consumers had known about the free repayment plan, they would have enrolled in it rather than refinancing their loan.

42.    For example:

    a.    At various times in 2018, 2019, and 2020, Consumer 1 took out multiple loans from ACE, paying at least $2,358 in refinance fees while eligible for a free repayment plan, including paying over $200 in refinance fees after March 2020. Consumer 1 told the Bureau that ACE would call him a few days before his payday or title loan was due and just tell him the refinance amount, without mentioning the option of a free repayment plan. He told

the Bureau that he would sometimes pay more than the refinance amount in order to pay the loan off faster to save money. He stated that he never knew about the free repayment plan option and would have used it if he had known about it.

b.   At various times in 2018, 2019, and 2020, Consumer 2 took out at least 6 loans with ACE and refinanced 34 times, paying at least $3,969 in total refinance fees while eligible for a free repayment plan. He paid over $600 in refinance fees after March 2020 and during the COVID-19 pandemic. Consumer 2 told the Bureau that he recalled ACE saying something about a repayment plan at some point but did not know that the plan was free or would have saved him any money. Consumer 2 told the Bureau that had he known about the free repayment plan when he refinanced, he would have used it.

c.   Consumer 3 took out one ACE loan shortly before losing his job during the COVID-19 pandemic. He refinanced it four times after March 2020, paying at least $829 in refinance fees while eligible for a free repayment plan. Consumer 3 told the Bureau that just before his loan was due, ACE would call and tell him the amount it would cost to refinance the loan. He stated that ACE never sought to collect the full amount or told him about a free repayment plan. Consumer 3 told the Bureau that had he known about the free repayment plan, he would have used it.

d.   In 2019, Consumer 4 took out at least 5 loans from ACE and paid at least $1,192 in refinance fees while eligible for a free repayment plan. Consumer 4 described Reminder Calls in which ACE would tell her that she had two options—pay the loan off or pay the interest and pay the loan off next time. Consumer 4 told the Bureau that she would have used the free repayment plan had she known about it, even if it required her to pay more money up front than paying to refinance.

e.   At various times after July 10, 2014, Consumer 5 took out at least 8 loans from ACE and paid at least $252.60 in refinance fees while eligible for a free payment plan. Consumer 5 described reminder emails rather than Reminder Calls. Consumer 5 said that the emails provide a link to refinance, which she did. After refinancing online, Consumer 5 called the store and learned about the free repayment plan, which she used. Consumer 5 stated that she would have used the free repayment plan sooner had she known about it.

f.   At various times in 2017 and 2020, Consumer 6 paid at least $3,387 in refinance fees while eligible for a free repayment plan, including at least $1,769 during the COVID-19 pandemic. Consumer 6 told the Bureau that ACE never told her about a free repayment plan and would have used one had she known about it.

43.      Since July 10, 2014, more than 670,000 consumers have paid ACE over $240 million in refinance fees to reborrow while eligible for a free repayment plan. This includes over $6.5 million in refinance fees paid between April 1, 2020 and April 1, 2021.

44.      ACE consumers who were unable to use a free repayment plan due to ACE's actions suffered or were likely to suffer substantial injury, which included their loss of funds, a longer time in debt, becoming or remaining trapped in a cycle of further renewals, and the repercussions that come from the inability to pay other bills due to the loss of their funds.

## UNAUTHORIZED WITHDRAWALS

45.      ACE typically requires that consumers sign an automated payment authorization form as part of its written agreement to take out a payday or title loan.

46.      If the consumer chooses a debit card as their payment method, the payment authorizations grant ACE the right to charge the consumer's debit card if a payment is not made on time and to re-initiate the charge a specified number of times if the withdrawal is unsuccessful.

47.      From January 2016 to March 2020, some payment authorization forms that ACE used in Arizona, Louisiana, Oregon, and Texas, authorized the company to attempt up to *two* debit-card re-initiations after an unsuccessful withdrawal attempt.

48.      From January 2016 to the present, ACE's practice in these four states has been to re-initiate debit card transactions up to *three* times after an unsuccessful attempt to withdraw a payment.

49.      The third re-initiation was unauthorized against consumers for whom ACE's payment authorization form permitted only two re-initiations.

50.     From January 2016 to March 2020, ACE withdrew over $1.3 million from over 3,000 consumers' debit-card accounts without authorization. One hundred and forty-five of the unauthorized withdrawals were for more than $1,000.

51.     After the inconsistency between ACE's re-initiation practices and its authorization forms was identified to ACE by Bureau examiners, ACE told the Bureau that it had refunded the money it withdrew via unauthorized re-initiations for payments on payday loans going back to January 1, 2018.

52.     ACE failed to identify to Bureau examiners or refund any unauthorized additional withdrawals made prior to that date, although such withdrawals existed.

53.     ACE failed to identify to Bureau examiners or refund any unauthorized additional withdrawals associated with title loans, although such withdrawals existed.

54.     Since at least October 9, 2020, ACE has known about over $640,000 in debits resulting from unauthorized debit-card re-initiations that ACE still has not refunded.

55.     ACE consumers who had payments attempted or withdrawn from their debit-card bank accounts without authorization likely suffered substantial injury, including their loss of funds, non-sufficient funds (NSF) charges from their banks, and the repercussions that come from the inability to pay other bills due to the loss of their funds.

56.     By March 2020, ACE had changed its payment authorization forms used in Arizona, Louisiana, Oregon, and Texas to authorize up to three attempted debit-card re-initiations after an unsuccessful withdrawal attempt.

## COUNT I
### ACE Deceptively Concealed a Free Repayment Plan Option When Consumers Expressed an Inability to Repay Their Current Loans

57.    The Bureau incorporates the allegations in Paragraphs 1 through 44 by reference.

58.    In numerous instances, since at least 2014, ACE directly or indirectly, expressly or by implication, represented to borrowers who had expressed an inability to repay their current ACE loan, that the only options available to them were a short grace period or a fee-based refinancing.

59.    In fact, many of these consumers had the contractual right to a free repayment plan and the free repayment plan would have been a less-expensive option for these consumers.

60.    ACE's acts or practices were likely to mislead a reasonable consumer into believing that payment in full or refinancing for a fee were the only options available to cure a default. A reasonable consumer who was eligible for a free repayment plan and informed ACE of their inability to repay their current loan would have expected ACE to have informed them that a free repayment plan was available.

61.    ACE's misrepresentations were material because they concerned the cost of credit and because many consumers would have used the free repayment plan instead of paying to refinance, had they known the free repayment plan was available.

62.    ACE's acts and practices as described herein constitute deceptive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## COUNT II
### ACE Used Unfair Means to Funnel Consumers into Costly Repayment Plans When Free Repayment Plans were Available

63.    The Bureau incorporates the allegations in Paragraphs 1 through 44 by reference.

64.    In numerous instances, since at least 2014, ACE induced hundreds of thousands of consumers, some of whom had expressed an inability to repay their current ACE loan, into

11

paying ACE over $240 million in refinance fees when they were eligible for a free repayment plan.

65.     Consumers who paid costly refinance fees when they could have used a free repayment plan likely suffered substantial injury including their loss of funds, a longer time in debt, becoming or remaining trapped in a cycle of further renewals, and the repercussions that come from the inability to pay other bills due to the loss of their funds.

66.     Due to ACE's misrepresentations regarding their repayment options, and some consumers' financial insecurity, the injury to consumers was not reasonably avoidable. Consumers in this situation had no reason to anticipate that ACE would fail to inform them of their eligibility for a free repayment plan, particularly after they informed ACE of their inability to pay the loan.

67.     ACE's practice of failing to disclose the free payment plan with other repayment options provides no benefits to consumers or competition.

68.     ACE's acts and practices as described herein constitute unfair acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

## COUNT III
**ACE Engaged in Abusive Acts or Practices by Materially Interfering with Consumers'
Ability to Understand a Term or Condition of Their Loans,
Namely That They had a Contractual Right to a Free Repayment Plan**

69.     The Bureau incorporates the allegations in Paragraphs 1 through 44 by reference.

70.     In numerous instances, since at least 2014, by offering a fee-based refinance while concealing a free repayment plan from eligible consumers, ACE interfered with consumers' ability to understand a term or condition of their payday or title loans.

71.     ACE's interference was material because its misrepresentations concerned the cost of credit and because many consumers would have used the free repayment plan instead of paying to refinance had they known it was available.

72.     ACE's acts and practices as described herein constitute abusive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (d)(1) and 5536(a)(1)(B).

### COUNT IV
**ACE Abusively Took Unreasonable Advantage of Consumers'
Lack of Understanding of the Cost or Conditions of Available Repayment Options**

73.     The Bureau incorporates the allegations in Paragraphs 1 through 44 by reference.

74.     Many ACE payment-plan-eligible consumers who paid to refinance their ACE loans lacked an understanding of available repayment options in one or more of the following ways:

      a.   They did not know the free repayment plan existed;

      b.   They did not know that they would not be charged additional fees to use the free repayment plan; or

      c.   They did not know that enrolling in the free repayment plan would relieve consumers of the obligation of making a payment before the loan's regularly scheduled due date.

75.     These differences are material because they concerned the cost of credit and because many consumers would have used the free repayment plan instead of paying to refinance had they known it was available.

76.     Since at least 2014, ACE collected over $240 million in refinance fees from consumers who were eligible for a free repayment plan.

77.     In numerous instances, since at least 2014, through its waterfall process and other acts and practices, ACE took unreasonable advantage of consumers' lack of understanding by marketing refinances to consumers, some of whom indicated their inability to repay their current debt, in a manner that obfuscated the existence, cost, or conditions of the free repayment plan.

78.     ACE's acts and practices as described herein constitute abusive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (d)(2)(A) and 5536(a)(1)(B).

**COUNT V**
**ACE Engaged in Unfair Practices When it**
**Withdrew Funds from Consumers' Bank Accounts Without Authorization**

79.     The Bureau incorporates the allegations in Paragraphs 1 through 22 and 45 through 56 by reference.

80.     Beginning in January 2016, ACE withdrew funds from consumers' debit card accounts without authorization at least 3,000 times, taking at least $1.3 million from at least 3,000 consumers.

81.     By taking at least 3,000 payday and title-loan consumers' money without authorization, ACE caused or was likely to cause these consumers substantial injury, including their loss of funds, NSF charges, and the repercussions that come from their inability to pay other bills due to the loss of their funds.

82.     This injury is not reasonably avoidable because consumers would not necessarily know about prior failed debit attempts and could not control when or how often ACE tried to access their accounts.

83.     Withdrawing funds without authorization provides no benefits to consumers or competition.

14

84.     ACE's acts and practices as described herein constitute unfair acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

## PRAYER FOR RELIEF

Wherefore, the Bureau requests that this Court:

    a.    Permanently enjoin Defendant ACE from committing future violations of the CFPA;

    b.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the CFPA, including but not limited to rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation from unjust enrichment, and payment of damages;

    c.    Award Plaintiff civil money penalties;

    d.    Award Plaintiff the costs of bringing this action, and

    e.    Such other and further relief as this Court deems just and proper.

Dated:  July 12, 2022                Respectfully Submitted,

                                     Attorneys for Plaintiff,

                                     Consumer Financial Protection Bureau

                                     Eric Halperin
                                     *Enforcement Director*

                                     Richa Dasgupta
                                     *Deputy Enforcement Director*

                                     Michael Posner
                                     *Assistant Litigation Deputy*

                                     /s/ **Gregory Nodler**[*]
                                     Greg Nodler
                                     Senior Litigation Counsel
                                     E-mail: Gregory.Nodler@cfpb.gov
                                     Phone: 202-435-7671
                                     Fax: 202-435-7722

                                     Tianna Baez
                                     Senior Litigation Counsel
                                     E-mail: Tianna.Baez@cfpb.gov
                                     Phone: 240-459-4390

---

[*] Attorneys listed below this line intend to file applications to appear *pro hac vice*.