**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>vs.<br><br>POPULUS FINANCIAL GROUP, INC. d/b/a ACE CASH EXPRESS,<br><br>Defendant. | Civil Action No. 3:22-cv-01494-K |

**DEFENDANT POPULUS FINANCIAL GROUP, INC.**
**d/b/a ACE CASH EXPRESS'S MOTION TO DISMISS**
**FOR FAILURE TO STATE A CLAIM AND BRIEF IN SUPPORT**

**SIDLEY AUSTIN LLP**
Angela C. Zambrano
angela.zambrano@sidley.com
Robert S. Velevis
rvelevis@sidley.com
Barret V. Armbruster
barmbruster@sidley.com
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Chris J. Willis (*pro hac vice*)
chris.willis@troutman.com
Sarah T. Reise (*pro hac vice*)
sarah.reise@troutman.com
600 Peachtree Street, N.E.
Suite 3000
Atlanta, Georgia 30308
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT AND AUTHORITIES ........................................................................................ 3

I. Executive Enforcement Actions that Violate the Constitution and Statutory Authority Are Invalid as a Matter of Law and Subject to Dismissal Under Rule 12(b)(6). ............................. 3

II. This Action Is Unconstitutional and Without Statutory Authority Because CFPB's Current Funding Is Neither "Drawn from the Treasury" nor "from the Combined Earnings of the Federal Reserve System." ........................................................................................ 5

A. Congress authorized CFPB to draw public funds "from the combined earnings of the Federal Reserve System," which the Federal Reserve is required to remit to the Treasury. ........................................................................................ 5

B. The Supreme Court held CFPB's funding is subject to the Appropriations Clause to the extent it draws money from "earnings" or "surplus funds" of the Federal Reserve System "otherwise destined for the general fund of the Treasury." .............................. 7

C. CFPB's funding from any source other than the one authorized by Congress violates the Dodd-Frank Act and the Appropriations Clause. .................................................... 8

D. The Federal Reserve System has not had "earnings" or "surplus funds" to remit to the Treasury since September 2022 but continues to fund the CFPB. .............................. 13

CONCLUSION ........................................................................................ 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................3, 5

*AT&T Corp. v. Iowa Utils. Bd.*,
525 U.S. 366 (1999)....................11

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024).................... *passim*

*Cmty. Fin. Servs. Assoc. of Am., Inc. v. CFPB*,
51 F.4th 616 (5th Cir. 2022), *reversed on other grounds*, 601 U.S. 416 (2024) ....................3, 5

*Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trs.*,
855 F.3d 681 (5th Cir. 2017) ....................3

*Funk v. Stryker Corp.*,
631 F.3d 777 (5th Cir. 2011) ....................2, 14

*In re Glenn*,
900 F.3d 187 (5th Cir. 2018) ....................11

*Haygood v. Dies*,
No. 18-03866, 2023 WL 2326424 (5th Cir. Mar. 2, 2023) (per curiam)....................3

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017)....................5, 13

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)....................11

*Linenweber v. Sw. Airlines Co.*,
693 F. Supp. 3d. 661 (N.D. Tex. 2023) ....................3

*Long v. Turner*,
134 F.3d 312 (5th Cir. 1998) ....................9

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024)....................4, 9

*Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*,
512 F.3d 137 (5th Cir. 2007) ....................3

*New Process Steel, L.P. v. NLRB*,
560 U.S. 674 (2010)....................4, 13

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)....................4

*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990)....................3, 7, 9, 13

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020)....................13

*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018)....................9, 10, 11

**Constitutional and Statutory Provisions**

U.S. Const. art. I, sec. 9, cl. 7....................4

12 U.S.C. § 243....................15

12 U.S.C. § 289....................6, 10, 15

12 U.S.C. § 5311....................11

12 U.S.C. § 5328....................12

12 U.S.C. § 5367....................11

12 U.S.C. § 5381....................11

12 U.S.C. § 5497.................... *passim*

31 U.S.C. § 714....................2

31 U.S.C. § 1341....................4

**Rules**

Fed. R. Civ. P. 8....................5

Fed. R. Civ. P. 12....................2, 3, 5

**Legislative Materials**

Restoring American Financial Stabiliity Act of 2010, H.R. 4173,
111th Cong. (as passed by Senate, May 20, 2010)....................11

Wall Street Reform and Consumer Protection Act of 2009, H.R. 4173,
111th Cong. (as introduced in House, Dec. 2, 2009) ........................................................10, 11

**Other Authorities**

*Earnings*, Merriam-Webster Online Dictionary (Apr. 11, 2010) ....................................................9

*Earnings*, Oxford Dictionary of Accounting (4th ed. 2010)...........................................................9

## PRELIMINARY STATEMENT

The Supreme Court recently held it was constitutional for the Consumer Financial Protection Bureau ("CFPB" or "Bureau") to draw its funding from "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425-26 (2024) ("*CFSA*"). That ruling means the CFPB is not *unconstitutionally* funded, as the Fifth Circuit ruled. But it raises a new question: what if there are no surplus funds in the Federal Reserve System to fund the CFPB? Under the rationale of the Supreme Court ruling, it would follow that the CFPB lacks funding authority. Any action taken by the CFPB, including the prosecution of this lawsuit, would be contrary to law. By this motion, Defendant Populus Financial Group, Inc. ("Populus") requests dismissal on this basis.

Congress authorized the CFPB to draw its funding "from the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). But the Federal Reserve System has not had *any* combined earnings since September 2022.




1. The Reserve Banks transferred to the U.S. Treasury $19.3 billion from their capital surplus on December 28, 2015, which was the amount necessary to reduce aggregate Reserve Bank surplus to the $10 billion surplus limitation in the Fixing America's Surface Transportation Act.
2. The Reserve Banks transferred to the U.S. Treasury $3.175 billion from their capital surplus in 2018, of which $2.5 billion was the amount necessary to reduce aggregate Reserve Bank surplus to the $7.5 billion surplus limitation in the Bipartisan Budget Act of 2018 and $675 million was the amount necessary to further reduce aggregate Reserve Bank surplus to the $6.825 billion surplus limitation in the Economic Growth, Regulatory Relief, and Consumer Protection Act.
3. The Reserve Banks transferred to the U.S. Treasury $40 million from their capital surplus in 2021, which was the amount necessary to reduce aggregate Reserve Bank surplus to the $6.785 billion surplus limitation in the National Defense Authorization Act for 2021.
4. Most Reserve Banks suspended weekly remittances to the U.S. Treasury in September 2022, began to accumulate a deferred asset during 2022 and continued through 2023. Weekly, Reserve Banks perform individual earnings remittance calculations, and certain Reserve Banks, after providing for the cost of operations, payment of dividends, and any amount necessary to maintain surplus, continued to remit excess earnings to the U.S. Treasury intermittently.
5. The Reserve Banks reported the cost of operations in excess of earnings which occurs during a period when earnings are not sufficient to provide for the cost of operations, payment of dividends, and an amount necessary to maintain surplus.

Source: Board of Governors of the Federal Reserve System, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024), https://www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm.[1] Indeed, as of the date of this motion, the Federal Reserve System states that it will need to realize ***nearly $184.4 billion*** in future earnings (*i.e.*, profits) before it can cover costs of operations and resume payments to the Treasury.[2] That leaves *no funds* available to pay for the cost of the CFPB's operations.

Yet, the CFPB's Director continues to demand, and the Fed's Board of Governors continues to acquiesce and pay, hundreds of millions of dollars every quarter to "carry out the authorities of the Bureau." Such funding is contrary to law because, under the rationale of the Supreme Court's ruling, there are *no funds* available to pay for CFPB operations. CFPB and the Board of Governors are bound by Congress's mandate that the Federal Reserve System "shall" fund the CFPB only "from the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1).

In this case, CFPB seeks to saddle Populus with outrageous and unprecedented civil penalties and customer "remediation" for ostensibly (1) "concealing" a never previously challenged repayment-plan option that was plainly disclosed in customers' agreements and long known (and in fact blessed) by the CFPB during its examinations, and (2) resubmitting a debit-card charge one additional time to receive payments that consumers were obligated to (and had

---

[1] Courts in the Fifth Circuit take "appropriate judicial notice of . . . matters of public record directly relevant to the issue at hand," such as the federal government's own publicly available documents and statements, when reviewing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). It is undisputed that the Board of Governors of the Federal Reserve System is a federal agency. *See, e.g.*, 31 U.S.C. § 714(a) (defining Federal Reserve Board as "agency" subject to audit by U.S. Comptroller General).

[2] Board of Governors of the Federal Reserve System, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, fig. 6 & n.8 (July 25, 2024), https://www.federalreserve.gov/releases/h41/20240725/.

expressly consented to) pay. But the Court never should reach the merits of these claims. By prosecuting this enforcement action with unauthorized expenditures, the CFPB violates its own statutory funding authority. To the extent it is and has been using funding obtained in violation of law, it is violating the Appropriations Clause. If "Congress has appropriated no money for the payment" of government expenditures, "the Constitution prohibits that any money 'be drawn from the Treasury' to pay them." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). And the government's "improper use of unappropriated funds" in violation of the Appropriations Clause requires dismissal under the undisturbed rationale of the Fifth Circuit in *CFSA*. *Cmty. Fin. Servs. Assoc. of Am., Inc. v. CFPB*, 51 F.4th 616, 642-43 & n.17 (5th Cir. 2022), *reversed on other grounds*, *CFSA*, 601 U.S. 416. The Court thus should dismiss for failure to state a claim.

## <u>ARGUMENT AND AUTHORITIES</u>

### I. Executive Enforcement Actions that Violate the Constitution and Statutory Authority Are Invalid as a Matter of Law and Subject to Dismissal Under Rule 12(b)(6).[3]

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Constitution and laws of the United States circumscribe the lawful authority of federal agencies—any exercise of agency power that exceeds

[3] The Court stayed this action pending the Supreme Court's decision in *CFSA* (Doc. 30) after Populus moved to dismiss for failure to state a claim based on the same constitutional argument raised in *CFSA* (Doc. 16). After the stay lifted with the *CFSA* decision, the Court accepted the parties' proposed schedule for Populus to file another motion to dismiss and denied Populus's pending motion as moot "[b]ecause [Populus] is receiving an opportunity to file a new motion to dismiss." (Doc. 36.) Accordingly, Populus is authorized to file this Rule 12(b)(6) motion to dismiss under Fifth Circuit law holding "[s]ubsequent Rule 12 motions are allowed if they are based on a defense or on the complaint not stating a claim for which relief can be granted." *Haygood v. Dies*, No. 18-03866, 2023 WL 2326424, at *5 n.23 (5th Cir. Mar. 2, 2023) (per curiam) (*citing Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trs.*, 855 F.3d 681, 686 (5th Cir. 2017)); *see also Doe*, 855 F.3d at 686 ("We have previously held that Rule 12(g) does not require consolidation of defenses raised in a second Rule 12(b)(6) motion. . . . Instead, we said simply that Rule 12(h)(2) allows the filing of a second motion. We apply that same right to this case."); *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 141 (5th Cir. 2007) ("However, Rule 12(g) did not require consolidation here because Rule 12(h)(2) explicitly excepts from the consolidation requirement motions based on the defense of failure to state a claim upon which relief can be granted."); *Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d. 661, 687 (N.D. Tex. 2023) (Kinkeade, J.) ("Contrary to Plaintiffs' contention, the Court has discretion to address successive motions to dismiss for failure to state a claim.").

those bounds is subject to invalidation as a matter of law. *See, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 521-22, 557 (2014) (affirming invalidation of NLRB enforcement order issued by NLRB members who were invalidly appointed under Constitution's Recess Appointments Clause and lacked requisite quorum to act under National Labor Relations Act ("NLRA")); *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 687-88 (2010) (reversing NLRB enforcement orders entered by two-member Board in violation of NLRA's three-member quorum requirement). "[F]inal 'interpretation of the laws'" demarcating an agency's authority is "the proper and peculiar province of the courts," and the Constitution empowers courts to "exercise that judgment independent of influence from the political branches." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257, (2024) (quoting The Federalist No. 78, pp. 522, 525 (J. Cooke ed. 1961) (A. Hamilton)). A "reviewing court" therefore must, "as always, . . . independently interpret [a] statute and effectuate the will of Congress subject to constitutional limits." *Id.* at *14 (holding Administrative Procedure Act "incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions").

As explained below, the CFPB's current funding from sources other than the statutorily prescribed "combined earnings of the Federal Reserve System" violates the CFPB's own statutory funding provision and thus the Appropriations Clause. 12 U.S.C. § 5497(a)(1); *see also* U.S. Const. art. I, sec. 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). It also violates the federal statutory prohibition against federal officers or employees "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation," 31 U.S.C. § 1341(a)(1)(A), or "accept[ing] voluntary services . . . or employ[ing] personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection

of property," *id.* § 1342. Any Bureau action effected with such illegal funds or services is unlawful and subject to invalidation. *See Cmty. Fin. Servs. Assoc. of Am., Inc.*, 51 F.4th at 642-43 & n.17. The Bureau's complaint cannot state a plausible claim for relief if the Bureau prosecutes it with unlawful appropriations. *See Iqbal*, 556 U.S. at 679. Dismissal thus is required under Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 8(a), 12(b)(6).

## II. This Action Is Unconstitutional and Without Statutory Authority Because CFPB's Current Funding Is Neither "Drawn from the Treasury" nor "from the Combined Earnings of the Federal Reserve System."

### A. Congress authorized CFPB to draw public funds "from the combined earnings of the Federal Reserve System," which the Federal Reserve is required to remit to the Treasury.

It is well established that questions of statutory interpretation "begin, as [they] must, with a careful examination of the statutory text." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 83 (2017). Congress created the CFPB as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), "in response to the 2008 financial crisis." *CFSA*, 601 U.S. at 421 (citing 124 Stat. 1376). To shield the CFPB from "accountability" to future congresses that may be politically opposed to its activities, the 111th Congress enacted certain "novel structural features . . . providing the Bureau a standing source of funding outside the ordinary annual appropriations process." *Id.* at 422. The Dodd-Frank Act thus authorizes the Bureau to requisition "from the combined ***earnings*** of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out" the Bureau's activities, 12 U.S.C. § 5497(a)(1) (emphasis added), "subject only to a statutory cap," *CFSA*, 601 U.S. at 422.

The statute further authorizes the Bureau's Director "to determine that sums available to the Bureau under this section"—*i.e.*, "from the combined earnings of the Federal Reserve System," 12 U.S.C. § 5497(a)(1)—"will not be sufficient to carry out the authorities of the Bureau . . . for the upcoming year," *id.* § 5497(e)(1)(A). In that event, the Director must submit a report to

Congress and the President substantiating the Director's determination and the extent to which the Bureau's funding needs may exceed the amount provided from the Federal Reserve. *See id.* § 5497(e)(1)(B). Congress accordingly authorized an additional $200 million in appropriations for each of the first five fiscal years after Dodd-Frank's enactment, should the Director determine the Fed's funds to be insufficient and submit the requisite report to Congress. *See id.* § 5497(e)(2). However, Congress did ***not*** appropriate additional funds for that contingency from fiscal year 2015 onward, rather leaving it to future legislation to address any shortfall in funding the Bureau might experience. *See id.*

The Federal Reserve System's own authorizing statute requires that, after each Reserve bank pays "all necessary expenses of a Federal reserve bank" and certain statutorily required dividends, the "portion of net earnings of each Federal reserve bank which remains after dividend claims . . . have been fully met shall be deposited in the surplus fund of the bank." 12 U.S.C. § 289(a)(2). Then, "[a]ny amounts of the surplus funds of the Federal reserve banks that exceed, or would exceed, the [$6.825 billion aggregate surplus limit] ***shall be transferred to the Board of Governors of the Federal Reserve System for transfer to the Secretary of the Treasury for deposit in the general fund of the Treasury***." *Id.* § 289(a)(3)(B) (emphasis added). It follows that by authorizing the CFPB to be funded from this "surplus," the law requires CFPB activities to be paid only *after* all other necessary Federal Reserve expenses have been paid.

Put simply, Congress evaded potential political opposition to CFPB, but at the price of subjecting CFPB operations to the potential volatility in the profitability of the Federal Reserve System in any given fiscal year. Absent further appropriations by Congress, CFPB can operate only if the Federal Reserve has surplus funds to forward to the Treasury. *CFSA*, 601 U.S. at 425, 435 (citing 12 U.S.C. § 5497(a)(1)).

**B. The Supreme Court held CFPB's funding is subject to the Appropriations Clause to the extent it draws money from "earnings" or "surplus funds" of the Federal Reserve System "otherwise destined for the general fund of the Treasury."**

In *CFSA*, the Supreme Court held "[t]he statute that provides the Bureau's funding meets the[] requirements" of the Constitution's Appropriations Clause. 601 U.S. at 424. "Textually," the Appropriations Clause's "command is unmistakable—'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *CFSA*, 601 U.S. at 425 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). If "Congress has appropriated no money for the payment" of government expenditures, "the Constitution prohibits that any money 'be drawn from the Treasury' to pay them." *Richmond*, 496 U.S. at 424. The Appropriations Clause's fundamental purpose thus "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Id.* at 428.

So after considering "the Constitution's text, the history against which that text was enacted, and congressional practice immediately following ratification," the *CFSA* Court "conclude[d] that appropriations need only identify a source of public funds and authorize the expenditure of those funds for designated purposes to satisfy the Appropriations Clause." *CFSA*, 601 U.S. at 426. And the Bureau's funding statute satisfies those requirements. *See id.* at 435. First, "[t]he statute authorizes the Bureau to draw public funds from a particular source—'the combined earnings of the Federal Reserve System,' in an amount not exceeding an inflation-adjusted cap." *Id.* (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)-(B)). And second, "it specifies the objects for which the Bureau can use those funds—to 'pay the expenses of the Bureau in carrying out its duties and responsibilities.'" *Id.* (quoting 12 U.S.C. § 5497(c)(1)).

But the *CFSA* Court was clear that the Bureau's funding provision is only "subject to the requirements of the Appropriations Clause" because (1) "[t]he Bureau draws money from the Federal Reserve System"—specifically, the System's "combined earnings"; (2) "surplus funds in the Federal Reserve System would otherwise be deposited into the general fund of the Treasury"; and (3) "money otherwise destined for the general fund of the Treasury qualifies" as "Money . . . drawn from the Treasury." *Id.* at 425 (citing 12 U.S.C. §§ 289(a)(3)(B), 5497(a)(1)). The Court did not address whether the Bureau can draw funding from sources other than the "money otherwise destined for the general fund of the Treasury" as Congress decreed. *Id.*; *see generally CFSA*, 601 U.S. 416.

**C. CFPB's funding from any source other than the one authorized by Congress violates the Dodd-Frank Act and the Appropriations Clause.**

The Dodd-Frank Act limits transfers of funds from the Federal Reserve Board to the Bureau to only funds drawn "from the combined ***earnings*** of the Federal Reserve System," 12 U.S.C. § 5497(a)(1) (emphasis added), and thus qualifies as an "Appropriatio[n] made by Law" under the Appropriations Clause, *CFSA*, 601 U.S. at 435 (alteration in original). Although Dodd-Frank does not define "earnings," the *CFSA* Court interpreted that term to mean "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *CFSA*, 601 U.S. at 425. As demonstrated below, Supreme Court precedent and canons of statutory interpretation all support the *CFSA* Court's reading of "combined earnings of the Federal Reserve System," 12 U.S.C. § 5497(a)(1), as "surplus funds in the Federal Reserve System," *CFSA*, 601 U.S. at 425. "It follows that Congress has appropriated no money for the payment" of the Bureau's funding outside those surplus funds, "and the Constitution prohibits that any money 'be drawn from the Treasury' to pay for" expenditures drawn from sources other than

the surplus funds designated by Congress. *Richmond*, 496 U.S. at 424 (quoting U.S. Const. art. I, § 9, cl. 7).

1. *Ordinary Meaning at the Time Congress Enacted Dodd-Frank in 2010*

It is axiomatic that courts must interpret statutory terms "consistent with their 'ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). When Dodd-Frank was enacted in 2010, "earnings" ordinarily meant "the balance of revenue after deduction of costs and expenses." *Earnings*, Merriam-Webster Online Dictionary (Apr. 11, 2010), *retrieved from* https://web.archive.org/web/20100411052041/https://www.merriam-webster.com/dictionary/earnings. The Oxford Dictionary of Accounting similarly defined earnings as "the net income or profit of a business." *Earnings*, Oxford Dictionary of Accounting (4th ed. 2010).

The Bureau likely will argue that the Court should interpret "earnings" as "revenue" and ignore the other dictionaries' definitions of "earnings" as "net income or profit," *Earnings*, Oxford Dictionary of Accounting (4th ed. 2010). But the Bureau has no factual expertise or delegated authority for interpreting the Fed's or its own statutory funding provisions. *See Loper Bright*, 2024 WL 3208360, at *16-17. It accordingly is entitled to no deference when it comes to interpreting the meaning of these statutes. *See id.*

*CFSA*'s interpretation of "earnings" as "surplus funds," on the other hand, comports with the Merriam-Webster and Oxford Dictionary of Accounting definitions.[4] As demonstrated by the Fed's own authorizing statute and financial statements, surplus funds remitted by the Federal

[4] The Fifth Circuit has previously relied on the Oxford Dictionary of Accounting when interpreting accounting terms like "earnings." *See Long v. Turner*, 134 F.3d 312 (5th Cir. 1998) (consulting Oxford Dictionary of Accounting definition of "write-off"). The Court should do the same here.

Reserve System to the Treasury are net of costs and expenses. *See* 12 U.S.C. § 289(a)(1)(A) ("After all necessary expenses of a Federal reserve bank have been paid or provided for, the stockholders of the bank shall be entitled to receive an annual dividend on paid-in capital stock . . . ."), (a)(2) ("That portion of net earnings of each Federal reserve bank which remains after dividend claims under paragraph (1)(A) have been fully met shall be deposited in the surplus fund of the bank."), (a)(3)(b) ("Any amounts of the surplus funds of the Federal reserve banks that exceed, or would exceed, the limitation under subparagraph (A) shall be transferred to the Board of Governors of the Federal Reserve System for transfer to the Secretary of the Treasury for deposit in the general fund of the Treasury."). The Court thus should construe "earnings" as revenue net of costs and expenses, consistent with the "'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd.*, 585 U.S. at 284 (quoting *Perrin*, 444 U.S. at 42).

2. *Statutory Context*

The broader statutory context also supports *CFSA*'s equating of "earnings" with "surplus funds" remaining after payment of expenses. First, in enacting Dodd-Frank, Congress rejected a previous iteration of the CFPB's funding provision from the version of the legislation originally introduced in the House that would have drawn funds from the Federal Reserve's "total system expenses" as opposed to "combined earnings." *See* Wall Street Reform and Consumer Protection Act of 2009, H.R. 4173, 111th Cong. § 4109(a) (as introduced in House, Dec. 2, 2009). This alternative drafting would have allowed the Federal Reserve to transfer funds to the CFPB without any regard to whether it had "earnings." But Congress consciously jettisoned the initial draft in favor of limiting the Bureau's source of funding to "the combined earnings of the Federal Reserve System" in an amendment to Dodd-Frank on May 20, 2010, and this language was carried forth

into the version actually enacted by Congress and signed by the President. *Compare id.* ("shall transfer funds in an amount equaling 10 percent of the Federal Reserve System's total system expenses"), *with* H.R. 4173, 111th Cong. § 1017(a)(1) (as passed by Senate, May 20, 2010) ("shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau"), *and* 12 U.S.C. § 5497(a)(1) (same). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (emphasis in original); *see also AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 422-23 (1999) (Breyer, J., concurring in part and dissenting in part) (noting Congress discarded language that would have given FCC power it sought to exercise).

Second, Dodd-Frank uses the term "revenue" several times without referring to earnings in any capacity. *See, e.g.*, 12 U.S.C. §§ 5381(b) ("if the consolidated revenues of such company from such activities constitute less than 85 percent of the total consolidated revenues of such company"), 5311(a)(6)(A) ("the annual gross revenues derived by the company and all of its subsidiaries from activities that are financial in nature"), 5367(b)(2) ("as long as not less than 2/3 of the assets or 2/3 of the revenues generated from the activity are from or attributable to such company or affiliate"). It is a "cardinal rule that a statute is to be read as a whole, in order not to render portions of it inconsistent or devoid of meaning." *In re Glenn*, 900 F.3d 187, 190 (5th Cir. 2018). "We usually 'presume differences in language like this convey differences in meaning.'" *Wis. Cent. Ltd.*, 585 U.S. at 279 (quoting *Henson*, 582 U.S. at 86). So the usage of "earnings" rather than "revenue" in the CFPB's funding provision indicates that Congress intended these terms to hold different meanings.

And third, funding provisions for the other two federal agencies created under Dodd-Frank—the Financial Stability Oversight Counsel and Office of Financial Research—further validate that the CFPB's funding from "combined earnings" should not be conflated with "revenues." Under Dodd-Frank, "[a]ny expenses of the [Federal Stability Oversight] Counsel" were to "be treated as expenses of, and paid by, the Office of Financial Research," 12 U.S.C. § 5328, which in turn was to be funded for the first two years by "the Board of Governors" of the Federal Reserve System in "an[y] amount sufficient to cover the expenses of the Office," *id.* § 5345(c) (emphasis added). The Office of Financial Research then would be granted "Permanent self-funding" from "assessments equal to the total expenses of the Office" collected from certain bank holding companies and nonbank financial companies supervised by the Board of Governors. *Id.* § 5345(d). The 111th Congress could have granted CFPB a similar open-ended appropriation, whether from an unspecified source paid by the Federal Reserve Board (like the Office of Financial Research and Federal Stability Oversight Counsel's interim funding, *cf. id.* §§ 5328, 5345(c)) or through assessments levied on regulated entities (like the Office and Counsel's permanent self-funding, *cf. id.* §§ 5328, 5345(d)). But it did not. Instead, the Bureau's appropriation is limited to a statutorily capped transfer drawn "from the combined earnings of the Federal Reserve System." *Id.* § 5497(a)(1), (2). The Court should not read that provision expansively to encompass any income, revenue, or other source of funding at the Federal Reserve System when Congress did not appropriate such funds for the Bureau.

3. *Faithful Application of the Law as Written*

Lastly, the Bureau likely will argue that Congress never intended to allow the Bureau to be without a source of funding. But Congress explicitly envisioned the Bureau's Director returning to Congress, hat in hand, to request additional appropriations if they became necessary. *See* 12 U.S.C. § 5497(e)(1)(A), (e)(1)(B). Nothing prevents the Director from doing so in

situations where there are no combined earnings of the Federal Reserve System, and in fact that is what the Director *should have done* when there were no such earnings available to fund the Bureau's operations beginning in 2022. Indeed, the Supreme Court's Appropriations Clause precedents confirm that the Director's remedy "must lie with Congress." *Richmond*, 496 U.S. at 434 ("The rationale of the Appropriations Clause is that if individual hardships are to be remedied by payment of Government funds, it must be at the instance of Congress.").

Yet, even if Congress never contemplated the possibility that the Fed might one day have no earnings and deprive the Bureau its default source of funding, "it is never [the judiciary's] job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced." *Henson*, 582 U.S. at 89. Instead, "Congress's decision to require" the Bureau to be funded from the combined earnings of the Federal Reserve System, or to seek additional funding from Congress if necessary, "must be given practical effect rather than swept aside in the face of admittedly difficult circumstances." *New Process Steel*, 560 U.S. at 688 ("Section 3(b) [of the National Labor Relations Act], as it currently exists, does not authorize the Board to create a tail that would not only wag the dog, but would continue to wag after the dog died."). The Bureau's "desire to keep its doors open" does not override the commands of Congress. *Id.* Nor does it excuse violations of the separation of powers. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 205 (2020).

### D. The Federal Reserve System has not had "earnings" or "surplus funds" to remit to the Treasury since September 2022 but continues to fund the CFPB.

Starting in September 2022, the Federal Reserve System began suspending remittances of "excess earnings to the U.S. Treasury" because operating expenses started to substantially exceed the Reserve banks' income—primarily due to the nearly 18x increase from $5.7 billion in 2021 to $102.4 billion in 2022 for "[t]otal interest expense" paid to depository institutions and repurchase-

agreement counterparties. Board of Governors of the Federal Reserve System, *Federal Reserve Board announces Reserve Bank income and expense data and transfers to the Treasury for 2022* (Jan. 13, 2023), https://www.federalreserve.gov/newsevents/pressreleases/other20230113a.htm.[5] The Reserve banks' total interest expense increased another $178.7 billion so that total operating expenses exceeded income by more than $114.3 billion by the end of 2023.[6] As a result, the Federal Reserve System continued suspending remittances to the Treasury and recorded a deferred asset of $133.3 billion, signifying the amount of earnings the Reserve Banks must realize before resuming remittances to the Treasury.[7] And that astronomical figure continues to grow. By the date of this motion, the Federal Reserve System's "liability for earnings remittances due to the U.S. Treasury" numbers ***-$184.399 billion***.[8]

Meanwhile, despite the Federal Reserve System having no "surplus funds . . . otherwise destined for the general fund of the Treasury," *CFSA*, 601 U.S. at 425, the Bureau's Director continues to request hundreds of millions of dollars from the Board of Governors. *See, e.g.*, CFPB Funds Transfer Request, FY 2024 Quarter 3 (Mar. 25, 2024), https://files.consumerfinance.gov/f/documents/cfpb-frb-transfer-of-funds-fy-2024-q3_2024-03.pdf (requesting $104,200,000 as "the amount necessary to carry out the authorities of the Bureau for FY 2024 Q3" alone). The Board of Governors also continues to acquiesce, depositing the Director's requested funds into the CFPB's "Bureau Fund" at the Federal Reserve Bank of New York. *See* 12 U.S.C. § 5497(b)(1), (c)(2); *see, e.g.*, Board of Governors Letter re: Funding

---

[5] As noted *supra*, note 1, the Court may consider government documents and similar matters of public record without converting a 12(b)(6) motion to a motion for summary judgment. *See Funk*, 631 F.3d at 783.

[6] Board of Governors of the Federal Reserve System *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024), https://www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm.

[7] Board of Governors of the Federal Reserve System, *Federal Reserve Board releases annual audited financial statements* (Mar. 26, 2024), https://www.federalreserve.gov/newsevents/pressreleases/other20240326a.htm.

[8] Board of Governors of the Federal Reserve System, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, fig. 5 n.15, fig. 6 & n.8 (July 25, 2024), https://www.federalreserve.gov/releases/h41/20240725/.

Request (Apr. 2, 2024), https://files.consumerfinance.gov/f/documents/cfpb-frb-transfer-of-funds-fy-2024-q3_2024-04.pdf ("This is to inform you that the funds requested in Director Chopra's letter, dated March 25, 2024, were deposited into the Bureau of Consumer Financial Protection Fund located at the Federal Reserve Bank of New York on April 2, 2024.").

Where do the funds come from if not from the Federal Reserve System's "combined earnings" or "surplus funds"? From "assessments" levied by the Board of Governors on the Reserve banks to defray operating expenses. *See* 12 U.S.C. § 243; Federal Reserve Banks Combined Financial Statements as of and for the Years Ended December 31, 2023 and 2022, at 4 (Mar. 18, 2024), https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2023.pdf. In 2023, the Board assessed the Reserve banks "$0.7 billion to fund the operations of the Consumer Financial Protection Bureau," *supra*, note 6, and recorded the transfers as "operating expenses" in the Reserve banks' consolidated financials, Combined Financial Statements YE 2023, at 4. But it did so in contravention of Congress's direction that the Bureau is to be funded from the Federal Reserve System's combined ***earnings which otherwise would be deposited with the Treasury***, 12 U.S.C. §§ 289(a)(3)(B), 5497(a)(1), ***net of operating expenses***, *id.* § 289(a)(1)(A), (a)(2).

The Bureau's prosecution of this action—with funds levied by the Federal Reserve Board through above-the-line assessments of operating expenses from the Reserve banks' gross income or revenue, ***not*** "from the combined earnings of" or "surplus funds in the Federal Reserve System" "otherwise destined for the general fund of the Treasury"—flouts the Bureau's funding authority under Dodd-Frank and violates the Appropriations Clause under *CFSA*. 12 U.S.C. § 5497(a)(1); *see also CFSA*, 601 U.S. at 424-25, 435. As such, the Bureau's prosecution of this enforcement action with unconstitutional funds renders it invalid.

## CONCLUSION

For the foregoing reasons, the CFPB's claims should be dismissed for failure to state a claim for relief.

Dated: July 31, 2024

Respectfully Submitted,

*/s/ Angela C. Zambrano*

Angela C. Zambrano
Texas Bar No. 24003157
angela.zambrano@sidley.com
Robert S. Velevis
Texas Bar No. 24047032
rvelevis@sidley.com
Barret V. Armbruster
Texas Bar No. 24102922
barmbruster@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Chris J. Willis (*pro hac vice*)
Georgia Bar No. 766297
chris.willis@troutman.com
Sarah T. Reise (*pro hac vice*)
Georgia Bar No. 181567
sarah.reise@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree Street, N.E.
Suite 3000
Atlanta, Georgia 30308
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

*Attorneys for Defendant Populus Financial Group, Inc. d/b/a ACE Cash Express*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2024, I electronically filed the above Motion to Dismiss for Failure to State a Claim with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

*/s/ Angela C. Zambrano*
Angela C. Zambrano