# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br>         Plaintiff, <br><br>   v. <br><br> POPULUS FINANCIAL GROUP, INC. d/b/a ACE CASH EXPRESS, <br><br>         Defendant. | Civil Action No. 3:22-cv-01494-K |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

ARGUMENT .................................................................................................................. 2

    I.    Under its plain meaning, the "combined earnings of" the Federal Reserve System refers to the System's income. ................................................................................ 3

    II.   Defendant's bespoke definition of "earnings" is wholly atextual. ....................................... 5

    III.  The wider statutory scheme confirms the Bureau's reading and refutes Defendant's. ........ 9

        a.   The Dodd-Frank Act and Federal Reserve Act confirm that "earnings" means money earned. ......................................................................................................... 9

        b.   Defendant's other legislative sources do not support its position. ................................ 13

    IV.  Dismissal would not be warranted in any event. .................................................. 15

CONCLUSION .............................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abramski v. United States,*
   573 U.S. 169 (2014)............................................................................ 9

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,*
   601 U.S. 416 (2024).................................................................... 1, 2, 5, 6

*CFSA v. CFPB,*
   51 F.4th 616 (5th Cir. 2022)............................................................ 2

*CFSA v. CFPB,*
   104 F.4th 930 (5th Cir. 2024)................................................... 1, 15

*Collins v. Yellen,*
   594 U.S. 220 (2021).......................................................................... 15

*Schaeffler v. United States,*
   889 F.3d 238 (5th Cir. 2018)............................................................ 3

*United States v. Palomares,*
   52 F.4th 640 (5th Cir. 2022)............................................................ 9

*United States v. Rainey,*
   757 F.3d 234 (5th Cir. 2014)............................................................ 7

**Statutes**

12 U.S.C. § 243 ....................................................................................... 12

12 U.S.C. § 289 ....................................................................................... 11

12 U.S.C. § 289(a) ................................................................................. 12

12 U.S.C. § 289(a)(1)-(3) ....................................................................... 3

12 U.S.C. § 289(a)(1)-(2) ....................................................................... 8

12 U.S.C. § 289(a)(3)(B) ........................................................................ 3

12 U.S.C. § 290 ......................................................................................... 8

12 U.S.C. § 461(b)(12) ........................................................................... 7

12 U.S.C. § 5390(c)(3)(B)(ii) ............................................................... 14

12 U.S.C. § 5390(n)(2) ............................................................................................ 4

12 U.S.C. § 5390(s)(3) ............................................................................................ 15

12 U.S.C. § 5465(c) ................................................................................................. 5

12 U.S.C. § 5497 ..................................................................................................... 2

12 U.S.C. § 5497(a)(1) ................................................................................. 2, 11, 12

12 U.S.C. § 5497(a)(2)(A) ............................................................................... 11, 14

12 U.S.C. § 5497(d)(2)(A) ..................................................................................... 11

12 U.S.C. § 5497(e) ............................................................................................... 10

12 U.S.C. § 5511 ................................................................................................... 10

15 U.S.C. § 78u-6(g)(5)(D) ...................................................................................... 5

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, July 21, 2010, 124 Stat 1376 ................................... 14
    Pub. L. No. 111-203, § 210(n)(2) ................................................................. 4

**Other Authorities**

156 Cong. Rec. 13195 (2010) ................................................................................ 10

Alicia Tuovila, Investopedia, *Earnings: Company Earnings Defined, With Example of
    Measurement* (Jul. 19, 2024), www.investopedia.com/terms/e/earnings.asp ........................ 6, 7

Consumer Financial Protection Bureau, *CFO update through the first quarter of fiscal year 2024*,
    March 1, 2024 (rev. July 31, 2024), https://files.consumerfinance.gov/f/documents/cfpb_cfo-
    update_report_fy-2024_q1.pdf ........................................................................... 11

*Earnings*, Black's Law Dictionary (9th ed. 2009) ................................................. 4

*Earnings*, Black's Law Dictionary (12th ed. 2024) ............................................... 4

*Earnings*, Oxford Dictionary of Accounting (4th ed. 2010) ................................. 6

*Earnings*, Oxford English Dictionary (online ed. 2024) ....................................... 4

Federal Reserve System*, The Fed Explained: What the Central Bank Does* (Aug. 2021),
    www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf ........................................ 4

Federal Reserve, Fed Financial Statements – Archive,
    https://www.federalreserve.gov/aboutthefed/fed-financial-statements-archive.htm ............... 13

Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances –H.4.1*
 (July 25, 2024), https://www.federalreserve.gov/releases/h41/20240725/ ................................ 9

Federal Reserve, *Federal Reserve Board announces preliminary financial information for the
 Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024),
 www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm ............................... 3

Federal Reserve, *Federal Reserve Board announces Reserve Bank income and expense data and
 transfers to the Treasury for 2022* (Jan. 13, 2023),
 www.federalreserve.gov/newsevents/pressreleases/other20230113a.htm ............................... 9

Federal Reserve, *The Federal Reserve Banks Combined Financial Statements as of and for the
 years Ended December 31, 2012 and 2009 and Independent Auditors Report* (2010),
 https://www.federalreserve.gov/aboutthefed/files/BSTcombinedfinstmt2010.pdf .................. 12

Federal Reserve, *The Federal Reserve Banks Combined Financial Statements* (2015),
 https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2015.pdf ........................ 13

Federal Reserve, *The Federal Reserve Banks Combined Financial Statements* (2023),
 https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2023.pdf ........................ 13

S. Rep. No. 111-176 (2010) ................................................................................................. 10, 11

U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account*
(Sept. 2002), www.gao.gov/assets/gao-02-939.pdf. .............................................................. 5, 10

Wall Street Reform and Consumer Protection Act of 2009,
 H.R. 4173, 111th Cong. § 4109(a) (2009) ............................................................................ 14

## INTRODUCTION

Plaintiff Consumer Financial Protection Bureau brought this action against Defendant Populus Financial Group, Inc., a payday and title-loan lender, to address serious violations of federal law. Those violations include steering borrowers unable to repay their loans into costly refinances despite their eligibility to enroll in a free repayment plan, and taking money from borrowers' accounts without authorization. Defendant's violations, most of which the Bureau believes are still ongoing, have reaped hundreds of millions of dollars in added fees from borrowers already struggling to make ends meet.

Defendant's second motion to dismiss, like its first, does not engage with these well-supported allegations of wrongdoing or challenge the sufficiency of any of the Bureau's claims. Instead, Defendant seeks to avoid even having to answer those claims by offering a frankly fantastical attack on the Bureau's statutory method of funding, months after the Supreme Court upheld the validity of that funding in a 7-2 decision by Justice Thomas. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024); *see also CFSA v. CFPB*, 104 F.4th 930 (5th Cir. 2024) (on remand, "declaring that the Bureau's funding structure . . . is constitutional"). The Court should reject Defendant's argument for what it is: a desperate bid to avoid this suit, or at least to potentially buy more time for Defendant to continue its ongoing and harmful violations.

## BACKGROUND

The Bureau filed suit in July 2022, alleging that Defendant violated the Consumer Financial Protection Act by engaging in multiple unfair, deceptive, and abusive practices in connection with its payday-loan and title-lending business. *See* ECF No. 1.

Defendant filed a motion to dismiss two months later. ECF No. 16. That motion did not challenge the substance or sufficiency of the Bureau's allegations of wrongdoing, arguing only

1

that the complaint must be dismissed because the Bureau's statutory method of funding "violates the Constitution's Appropriations Clause." *Id.* at 1; *see also* 12 U.S.C. § 5497.

After a panel of the Fifth Circuit endorsed that view, *see CFSA v. CFPB*, 51 F.4th 616 (5th Cir. 2022), the Bureau filed a petition for certiorari and this Court stayed proceedings here pending the Supreme Court's consideration of *CFSA*, ECF No. 30. In May 2024, the Supreme Court issued its decision in *CFSA*, reversing the Fifth Circuit and upholding the validity of the Bureau's funding. *CFSA*, 601 U.S. 416 (2024).

When this case resumed, nearly two years after it was filed, the Court denied Defendant's first motion to dismiss as moot but noted that Defendant could file another, which Defendant has done. ECF No. 37. Defendant's new motion, like its first motion, has no answer to the substance of the Bureau's allegations and does not dispute that those allegations are well pled. It merely purports to find new fault with the Bureau's funding.

## ARGUMENT

Undaunted by the Supreme Court's recent decision upholding the Bureau's funding, Defendant contends that a problem remains. In Section 5497 of the Dodd-Frank Act—the law that established the Bureau—Congress authorized the Bureau to draw its funding from "the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). Defendant reads the word "earnings" in a very specific—and, as will be explained, obviously incorrect—way. It says that "earnings" must be read to refer to the Federal Reserve System's "surplus" funds that would "otherwise be deposited into the general fund of the Treasury." ECF No. 37 at 1. Under the Federal Reserve Act, the funds destined for Treasury are a specific bucket of money: What remains of the Federal Reserve Banks' income after (1) paying the Banks' expenses (including assessments levied by the Federal Reserve Board); (2) paying dividends to the Banks'

2

shareholders (private banks); and (3) making deposits into the surplus accounts maintained by each Federal Reserve Bank, up to a specified cap. 12 U.S.C. § 289(a)(1)-(3) (providing for payment of those obligations in that order). If funds remain after making all of those payments, the Federal Reserve Banks transfer those excess net earnings for deposit in the Treasury's general fund on a weekly basis. *Id.* § 289(a)(3)(B); *see also* Federal Reserve, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024), www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm (describing weekly remittances) (hereinafter, "FRB 2024 Release").

Recently, however, and due largely to the impact of changing interest rates resulting from the Federal Reserve's implementation of monetary policy, the Reserve Banks have not consistently generated excess net earnings and thus "[m]ost . . . suspended weekly remittances to the U.S. Treasury in September 2022." FRB 2024 Release (also noting that "certain Reserve Banks . . . [have] continued to remit excess earnings to the U.S. Treasury intermittently"). Defendant says this means the Bureau cannot validly draw and spend any money at this time.

Defendant is wrong. Its self-serving interpretation of the word "earnings" is contrary to ordinary meaning, without support in the text of Section 5497 or the broader statutory context, and would be unworkable to boot. None of Defendant's arguments show otherwise; they demonstrate only Defendant's desperation to avoid the well-pled claims in the Bureau's complaint.

**I.    Under its plain meaning, the "combined earnings of" the Federal Reserve System refers to the System's income.**

"A fundamental canon of statutory construction instructs that in the absence of a statutory definition, we give terms their ordinary meaning." *Schaeffler v. United States*, 889 F.3d 238, 243 (5th Cir. 2018). Defendant agrees (at 9) that the Court should look to ordinary meaning.

A common, everyday meaning of "earnings"—both now and at the time the Bureau's statute was enacted—is "revenue" or "income" generated from labor, services, or investments. *See Earnings*, Black's Law Dictionary (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets. See INCOME."); *Earnings*, Black's Law Dictionary (9th ed. 2009) (same); *Earnings*, Oxford English Dictionary (online ed. 2024) ("[T]he money made through working, trade or business activity, etc."; "The income produced by invested capital.").

That ordinary meaning fits this statute to a T. The bulk of the money generated by the Federal Reserve comes from "interest earned on the securities [the Federal Reserve] owns—securities acquired in the course of the Federal Reserve's open market operations." Federal Reserve System, *The Fed Explained: What the Central Bank Does*, at 5 (Aug. 2021), www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf. Most of the rest comes from "fees received for priced services provided to depository institutions—such as check clearing, funds transfers, and automated clearinghouse operations." *Id.* at 4. The statute's reference to the Federal Reserve System's "earnings" refers to this "[r]evenue gained from . . . services, from the investment of capital, or from assets." *Earnings*, Black's Law Dictionary (9th ed. 2009).

Confirming this interpretation, the term "earnings" is used in just the same way throughout the Dodd-Frank Act to refer to income or money earned. *See* Pub. L. No. 111-203, § 210(n)(2) (directing the FDIC to deposit "interest and other *earnings* from investments" into Orderly Liquidation Fund) (codified at 12 U.S.C. § 5390(n)(2)); *id.* § 806(c) (authorizing

4

Reserve Banks to "pay *earnings* on balances maintained by or on behalf of" certain systemically important financial entities) (codified at 12 U.S.C. § 5465(c)); *id.* § 922(a) (requiring SEC to report "the amount of *earnings* on investments" made from its Investor Protection Fund) (codified at 15 U.S.C. § 78u-6(g)(5)(D)).

Although last year the Federal Reserve's "sum total of expenses exceeded estimated earnings," the Federal Reserve continues to generate many billions of dollars in earnings, much of it from interest income on securities. FRB 2024 Release (reporting that income from this source alone "totaled $163.8 billion in 2023"). The statute authorizes the Bureau to draw and spend money from those earnings.

## II.    Defendant's bespoke definition of "earnings" is wholly atextual.

Defendant offers a different, cramped, and highly idiosyncratic understanding of the term "earnings" that it hopes will allow it to escape liability here. Defendant claims that the term means the amount of the Federal Reserve System's earnings that would otherwise go to Treasury—that is, the amounts that remain after the Federal Reserve Banks pay their necessary expenses (somehow other than the expense of paying assessments levied to fund the Bureau), dividends to their shareholders, and deposits into their surplus funds.[1] Defendant claims this represents the "ordinary meaning" of the word. That view is entirely without basis.

Defendant first seeks support in the Supreme Court's *CFSA* ruling, but it seriously misrepresents that opinion. Defendant says that *CFSA* "interpreted that term ['earnings'] to mean

---

[1] Defendant confuses matters by repeatedly referring to the excess earnings that the Federal Reserve remits to Treasury as "surplus funds." Those remittances to Treasury are not the same thing as the "surplus fund" accounts held at each of the Reserve Banks and which are essentially rainy-day funds "represent[ing] cumulative retained net earnings for the Reserve Banks—that is, cumulative net earnings not paid to the Department of the Treasury." *See* U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account* 1 (Sept. 2002), www.gao.gov/assets/gao-02-939.pdf.

'surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury.'" Mot. at 8 (quoting *CFSA*, 601 U.S. at 425). The Court did nothing of the sort, as even a brief review of its opinion confirms. The Court discussed the Federal Reserve's transfers to Treasury only to address the "threshold" question of whether the Bureau's funding transfers from the Federal Reserve are even "subject to the requirements of the Appropriations Clause[,]" given that the Clause limits when money may be "'drawn *from the Treasury*.'" *CFSA*, 601 U.S. at 425 (quoting Art. I, § 9, cl. 7) (emphasis added). The Court concluded that, whatever else the Clause may govern, it applies to "money otherwise destined for the general fund of the Treasury." *Id.* In reaching that conclusion, the Court did not endorse the implausible interpretation of the term "earnings" that Defendant urges. It did not interpret that provision at all, which is hardly surprising given that the question presented did not encompass—and the parties did not dispute—the meaning of "earnings."

Defendant next relies (at 9) on a U.K. dictionary of accounting and the second of two definitions offered by an online dictionary. (The first definition—"something (as wages) earned"—supports the Bureau, so Defendant simply ignores it.) To begin, an accounting dictionary would seem an odd place to look for the "ordinary meaning" of a common, everyday term like "earnings"—a term that every wage-earner will be familiar with. And even Defendant's accounting dictionary notes that "there has been considerable debate as to [the] definition" of the term even as used in that specialized context. Oxford Dictionary of Accounting at 161 (4th ed. 2010). But it is true that in particular circumstances, the term can be used to refer to a private company's "after-tax net income" or "profits." *See, e.g.*, Alicia Tuovila, Investopedia, *Earnings: Company Earnings Defined, With Example of Measurement* (Jul. 19, 2024), www.investopedia.com/terms/e/earnings.asp.

For two reasons, that does not help Defendant. First, Defendant's argument overlooks that "[i]t is long settled that words in statutes should be given their ordinary, popular meaning unless Congress *clearly meant* the words in some more technical sense." *United States v. Rainey*, 757 F.3d 234, 242 (5th Cir. 2014) (emphasis in original). Here, there is no reason to think that Congress, when providing for the funding of a new agency from the money generated by the country's central bank, had in mind a specialized meaning of "earnings" that can sometimes apply in the very different context of private companies.

And second, Defendant is not actually arguing that the statute's reference to "earnings" should be read to mean "after-tax net income" or "profits," as it can in the private-company context. It urges a far narrower view of "earnings" as what is left over after the payment of (among other things) dividends to stockholders of the Reserve Banks. Even in the private-company context, however, "earnings" are not what is left over after dividends are paid; rather, earnings are used to *pay* dividends. *See, e.g.*, *Earnings*, Investopedia (explaining that a "company's earnings"—in that context, "its profits"—"can be used to reward stockholders with dividends").

Put differently, Defendant first claims ordinary meaning should control, then ignores ordinary meaning for a more specialized definition sometimes used for private companies, then abandons *that* definition for an even narrower one with no basis in any recognized understanding of the term. Whatever else this may be, it is not a sound way to determine the meaning of statutory text.

Defendant then looks for help (at 10) in "the Fed's own authorizing statute and financial statements." But the very sources on which Defendant seeks to rely directly contradict its position. Start with the Federal Reserve Act. Where that Act refers to "earnings," the term clearly

bears its ordinary meaning of income or money earned. *See* 12 U.S.C. § 461(b)(12) (providing for the payment of "earnings" on balances maintained at a Federal Reserve Bank). By contrast, the Act uses the different term "*net* earnings" to describe the amount of earnings—i.e., revenue—left after "all necessary expenses of a Federal reserve bank have been paid or provided for" (but before payment of dividends and deposits to the surplus funds). *Id.* § 289(a)(1)-(2); *see also id.* § 290 (directing how the Treasury Secretary may use whatever portion of "net earnings" are transferred to Treasury). What this shows is that Congress is fully capable of specifying particular amounts on the Federal Reserve's balance sheet when that is its intention and does not use the generic term "earnings" when it means something more specific. It is a mystery why Defendant thinks these provisions help it.

The same goes for the Federal Reserve publications Defendant cites, beginning with the chart Defendant reproduces on the first page of its motion to support the claim that the Federal Reserve has had no "earnings" since September 2022. That chart shows what it specifically refers to as the Federal Reserve's "cost of operations *in excess of earnings*"—i.e., in excess of revenues—and it explains that such shortfalls arise "during a period when *earnings* are not sufficient to provide for the cost of operations, payment of dividends, and an amount necessary to maintain surplus." Mot. at 1 (n.5 of the chart, emphasis added). Where the chart refers to the money remitted to Treasury, at n.4, it uses the different term "excess earnings" instead. So the very Federal Reserve publication on which Defendant seeks to rely refutes Defendant's position because it clearly uses the term "earnings" in its common, ordinary sense of "revenue" or "money earned"—and not in the idiosyncratic way Defendant wishes it would be read.

The same is also true of other Federal Reserve publications on which Defendant relies. For example, Defendant cites (at 2 n.2) a Federal Reserve financial report in an attempt to equate

earnings with profits, but that report explains that the Reserve Banks "remit residual *net* earnings to the U.S. Treasury" and that they cease doing so when "earnings"—i.e., revenues—"are not sufficient to provide for the cost of operations, payment of dividends, and maintaining surplus." (emphasis added) Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, fig. 6 & n.8 (July 25, 2024), https://www.federalreserve.gov/releases/h41/20240725/. Or take a 2023 Federal Reserve press release that Defendant also cites (at 13-14). That release too clearly uses the term "earnings" to mean revenue or money earned. Federal Reserve, *Federal Reserve Board announces Reserve Bank income and expense data and transfers to the Treasury for 2022* (Jan. 13, 2023), www.federalreserve.gov/newsevents/pressreleases/other20230113a.htm (referring to "earnings" as what "provid[es] for" "operating costs, payments of dividends, and any amount necessary to maintain surplus," not as what remains after providing for those costs). Far from supporting Defendant's position, these sources reflect the unmistakable understanding that the unmodified word "earnings" means simply revenue or money earned.

**III.    The wider statutory scheme confirms the Bureau's reading and refutes Defendant's.**

"[A] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Abramski v. United States*, 573 U.S. 169, 179 n.6 (2014); *accord United States v. Palomares*, 52 F.4th 640, 642 (5th Cir. 2022). The broader statutory context confirms that the term "earnings" in Section 5497 means revenue or money earned, not the gerrymandered definition Defendant urges.

    **a.    The Dodd-Frank Act and Federal Reserve Act confirm that "earnings" means money earned.**

Congress created the Bureau after the 2008 financial crisis in an effort to prevent future crises by ensuring that the federal consumer financial laws are adequately enforced. *See, e.g.*, 12 U.S.C. § 5511 (specifying purposes and objectives of the Bureau). Congress deemed "the assurance of adequate funding" to be "absolutely essential" for the new agency, and so funded the Bureau as it did. S. Rep. No. 111-176, at 163 (2010); *see also* 156 Cong. Rec. 13195 (2010) (statement of Sen. Dodd) ("The conference report requires the Federal Reserve System to *automatically fund* the CFPB. . . . This will ensure that the CFPB has the resources it needs to perform its functions . . . .") (emphasis added).

Giving the statutory language its ordinary meaning is consistent with this background because it ensures that the Bureau is adequately funded from the money generated by the Federal Reserve. By contrast, on Defendant's view, the Congress that created the Bureau set up the new agency so that it would be intermittently and unpredictably mothballed, potentially unable to carry out its statutory role overseeing the financial markets at precisely those times that economic disruptions were causing shortfalls at the Federal Reserve.[2] That is not a plausible reading of the statute.

Defendant tries to wish this problem away by pointing out (at 12-13) that the statute authorizes the Bureau to seek additional appropriations from Congress. *See* 12 U.S.C. § 5497(e). But that authorization was very obviously meant for a situation where additional funds were needed above what the Bureau could receive in transfers from Federal Reserve earnings—which

---

[2] The Congress that enacted Dodd-Frank would surely have been aware, particularly in the immediate wake of the 2008 financial meltdown, of the possibility of such shortfalls. *See* U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account* 11 (Sept. 2002), www.gao.gov/assets/gao-02-939.pdf (reporting that, from 1989 to 2001, "11 of the 12 Reserve Banks reported a total of 352 weeks in which earnings were less than expenses and losses")*.* The possibility of shortfalls is the reason that each Reserve Bank maintains a surplus fund, "to act as a cushion to absorb losses." *Id.* at 3.

Section 5497(a)(2) caps at a specified amount,[3] *id.* § 5497(a)(2)(A). That is why subsection (e) requires the Director, in requesting appropriations under that section, to report to Congress on "the extent to which the funding needs of the Bureau are anticipated *to exceed the level of the amount set forth in subsection (a)(2)*." Defendant's interpretation of convenience once again cannot be squared with the statutory language. It is also directly contrary to Congress's goal that the Bureau have an "assurance of adequate funding" and be "independent of the [annual] Congressional appropriations process." S. Rep. No. 111-176, at 163. And it would be completely unworkable, including because it would require the Bureau and Congress to forecast shortfalls at the Federal Reserve with sufficient time to appropriate funds for the Bureau's continued operations.

Defendant's interpretation would be unworkable in other ways as well, and fails to account for how the Federal Reserve actually operates. Each of the 12 Reserve Banks remits its excess net earnings to Treasury each week. *See* FRB 2024 Release; 12 U.S.C. § 289. By statute, the Bureau draws money either annually or quarterly. *Id.* § 5497(a)(1). How, in Defendant's view, would a court determine the amount that the Bureau could validly draw in a given year or quarter? (Defendant incorrectly claims (at 13), for example, that the Federal Reserve has sent no money to Treasury since September 2022, when in fact "certain Reserve Banks . . . continued to remit excess earnings to the U.S. Treasury intermittently" after that time, and across 2022 as a whole, the Federal Reserve remitted billions of dollars to Treasury. *See* FRB 2024 Release.)

---

[3] The cap is set at 12 percent of the Federal Reserve System's operating expenses as reported in the Board's 2009 Annual Report, adjusted according to a specialized measure of inflation. 12 U.S.C. § 5497(d)(2)(A). In fiscal year 2024, that inflation-adjusted cap is equal to $785.4 million. *See* Consumer Financial Protection Bureau, *CFO update through the first quarter of fiscal year 2024*, March 1, 2024 (rev. July 31, 2024), https://files.consumerfinance.gov/f/documents/cfpb_cfo-update_report_fy-2024_q1.pdf.

Defendant's reading would require courts to play auditor not only to the Federal Reserve but to the Bureau, since they would also need to somehow determine when the Bureau drew the particular moneys that it spent on a challenged agency action. These absurd consequences provide another reason, if any were needed, to reject Defendant's view.

Defendant's interpretation of "earnings" cannot be squared with the Federal Reserve Act, either. Under the waterfall that the Federal Reserve Act establishes for the use of the Federal Reserve Banks' earnings, transfers to the Bureau fall in the first tier. In particular, the Banks first must satisfy all of their "necessary expenses" before paying stockholders their dividend entitlement, depositing funds in the Banks' surplus funds until they reach a cap, and then remitting remaining net earnings to Treasury. 12 U.S.C. § 289(a). The necessary expenses of the Banks include semiannual assessments that the Federal Reserve Board levies on the Banks "to pay [the Board's] estimated expenses." *Id.* § 243. And, under the Dodd-Frank Act, the necessary expenses of the Federal Reserve Board in turn include the amounts that the Board must transfer to the Bureau from the Federal Reserve System's earnings to meet the Bureau's funding needs. *See id.* § 5497(a)(1) (providing the Board "shall transfer" the amount the Bureau requests). Thus, the Federal Reserve Board levies assessments on the Banks to obtain funding needed to cover both the Board's own expenses and the funds it must transfer to the Bureau—and those assessments are necessary expenses of the Banks that are paid first under the Federal Reserve Act.

This is precisely what the Federal Reserve Board has implemented for years—long before the Banks' costs began to outstrip their earnings in 2022.[4] Contrary to Defendant's

---

[4] *See, e.g.*, Federal Reserve, *The Federal Reserve Banks Combined Financial Statements as of and for the years Ended December 31, 2012 and 2009 and Independent Auditors Report*, 5

insinuation (at 15) that the Board's assessment of funds from the Banks to pay for the Bureau's quarterly transfers was unique to the 2022 and 2023 fiscal years, and thereby done "in contravention of Congress's direction," the Board and the Banks have funded the Bureau in this manner consistently since its inception—including in quarters and years in which the Federal Reserve System was transferring excess net earnings to Treasury.[5] The Federal Reserve has always treated transfers to the Bureau as necessary expenses of the Federal Reserve System because that is what Congress intended. Defendant's view of the Bureau as a fair-weather regulator—to be funded in times of plenty and boarded up in times of scarcity—cannot be reconciled with Congress's commands in the Dodd-Frank Act and the Federal Reserve Act.

**b.      Defendant's other legislative sources do not support its position.**

Defendant scrapes together what support it can to justify its position, but none of its other arguments holds water. First, Defendant misreads (at 10-11) an early draft of the legislation establishing the Bureau. Defendant says that under this early draft, the Bureau "would have drawn funds from the Federal Reserve's 'total system expenses' as opposed to 'combined earnings.'" Wrong again. What the draft actually said was that the Federal Reserve "shall transfer funds in an amount equaling 10 percent of the Federal Reserve System's total system expenses" to the new agency. Wall Street Reform and Consumer Protection Act of 2009, H.R.

---

(2010), https://www.federalreserve.gov/aboutthefed/files/BSTcombinedfinstmt2010.pdf (listing "Bureau of Consumer Financial Protection" among "Assessments" under the Banks' combined Operating Expenses for 2010, the Bureau's first year of operations); Federal Reserve, *The Federal Reserve Banks Combined Financial Statements*, 4 (2015), https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2015.pdf (same for 2014 and 2015); Federal Reserve, *The Federal Reserve Banks Combined Financial Statements*, 4 (2023), https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2023.pdf (same for 2022 and 2023).

[5] Federal Reserve, Fed Financial Statements – Archive (Combined Financial Statements are available going back to 2008), https://www.federalreserve.gov/aboutthefed/fed-financial-statements-archive.htm.

4173, 111th Cong. § 4109(a) (as introduced in House, Dec. 2, 2009). Contrary to Defendant's claim, that language says nothing explicit about the *source* of the transferred funds. It merely imposes a cap on the Bureau's level of funding, similar to the one Congress ultimately enacted, *see* 12 U.S.C. § 5497(a)(2)(A) (providing that "the amount that shall be transferred to the Bureau in each fiscal year shall not exceed a fixed percentage [specified elsewhere] of the total operating expenses of the Federal Reserve System"). The fact that an early draft of the legislation did not expressly identify the source of the funds the Federal Reserve was to transfer, and the version actually enacted did, does nothing to support Defendant's absurd reading of the statute as enacted.

Second, Defendant points (at 11) to instances where the Dodd-Frank Act uses the term "revenue" and says this shows Congress meant something different when it said "earnings." But given the length and complexity of the Act, Defendants' argument is exceedingly weak even on its own terms. It overlooks that Defendant's cited examples all refer to the revenue of private companies. As noted, in that specific context—very different from Section 5497's provision of funding for a government agency from the nation's central bank—"earnings" can sometimes refer to profits. Congress may therefore have reasonably used the word "revenue" in that different context to avoid potential confusion. Worse for Defendant, the Dodd-Frank Act also employs the term "profits." *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, July 21, 2010, 124 Stat 1376 (providing that certain compensatory damages against the FDIC do not include "damages for lost profits") (codified at 12 U.S.C. § 5390(c)(3)(B)(ii)); *id.* (requiring FDIC to issue regulations defining "compensation" to include "any profits realized from the sale of the securities of the covered financial company") (codified

at 12 U.S.C. § 5390(s)(3)). Under Defendant's logic, these instances demonstrate that Congress did *not* mean "profits" when it used the term "earnings" in Section 5497.

Third, Defendant cites (at 12) the Financial Stability Oversight Council and Office of Financial Research as examples of agencies that Congress chose to fund either directly through assessments or "from an unspecified source paid by the Federal Reserve Board[.]" But so what? The mere fact that Congress could have—but did not—adopt the exact same regimes as it did for those other agencies gets Defendant nowhere in its efforts to escape the plain meaning of "earnings" in Section 5497.

## IV.    Dismissal would not be warranted in any event.

Even if Defendant's claim were correct, it would not require dismissing this action. Defendant's broad assertion (at 3-4) that any constitutional or statutory issue renders executive action invalid is incorrect. *See, e.g., Collins v. Yellen*, 594 U.S. 220, 258 (2021) (rejecting argument that an unconstitutional restriction on the President's removal power automatically renders agency action invalid); *id.* at 261-71 (Thomas, J., concurring) (elaborating on why "[t]he Government does not necessarily act unlawfully even if a removal restriction is unlawful in the abstract"). And Defendant's reliance (at 5) on the Fifth Circuit's remedial holding in *CFSA* is misplaced; the Fifth Circuit itself concluded that the Supreme Court had "reversed our judgment in its entirety," *see CFSA*, 104 F.4th 930 (5th Cir. 2024). While Defendant also looks for help (at 4-5) in the Anti-Deficiency Act, it cites no authority supporting its apparent view that appropriate remedies under that Act include dismissal of an otherwise valid public enforcement action. In short, Defendant has failed to identify any authority supporting its desire for dismissal.

## CONCLUSION

For all these reasons, the Court should deny the motion to dismiss and allow this long-delayed public enforcement action to proceed.

Dated:  August 30, 2024                           Respectfully submitted,


                                                  */s/  Andrea J. Matthews*
                                                  Seth Frotman
                                                    *General Counsel*
                                                  Steven Y. Bressler
                                                    *Deputy General Counsel*
                                                  Kristin Bateman
                                                    *Assistant General Counsel*

                                                  Andrea J. Matthews (MA #694538)
                                                  Kevin E. Friedl (NY #5240080)
                                                    *Senior Counsel*
                                                  Consumer Financial Protection Bureau
                                                  1700 G Street NW
                                                  Washington, DC 20552
                                                  (202) 407-2324 (phone)
                                                  (202) 435-7024 (facsimile)
                                                  andrea.matthews@cfpb.gov

16

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2024, I electronically filed the foregoing Opposition to Defendant's Motion to Dismiss using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/  Andrea J. Matthews*
Andrea J. Matthews